**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CIVIL ACTION NO. 1:15CR-00030-GNS**

**UNITED STATES OF AMERICA**                                        **PLAINTIFF**

**VS.**

**TREY ALEXANDER GWATHNEY-LAW**                          **DEFENDANT**

**FINDINGS OF FACT, CONCLUSIONS OF LAW
AND RECOMMENDATION**

BACKGROUND

This matter is before the court on motion of Defendant, Trey Alexander Gwathney-Law ("Gwathney-Law"), for suppression of evidence obtained during a search of his residence (DN 28).  The United States of America ("United States") filed a response (DN 31) in which it conceded the motion raised issues of fact and, as such, an evidentiary hearing would be appropriate.  The motion was referred to the undersigned to conduct an evidentiary hearing and submit a report and recommendation on the disposition of the motion pursuant to 28 U.S.C. § 636(b)(1)(B) (DN 32).

The undersigned conducted the evidentiary hearing on August 25, 2016 (DN 40 Order). During the evidentiary hearing, the United States presented testimony from Lieutenant Dale Adams and Patrol Officer Serhiy Varyvoda with the City of Franklin, Kentucky, Police Department, and admitted into evidence two DVDs containing video clips from the witnesses' body cameras.  Gwathney-Law cross-examined the prosecution witnesses.  Following the hearing, the United States and Gwathney-Law filed supplemental briefs (DN 45, 47).  The matter stands submitted to the undersigned for issuance of a report and recommendation.

FINDINGS OF FACT

On November 3, 2015, the grand jury issued a two count indictment arising out of Gwathney-Law's possession and manufacture of five Molotov cocktails on September 27, 2015 (DN 4).   The indictment indicates all five Molotov cocktails were made with glass soda bottles and contained a mixture of gasoline and oil (Id.).   Four of the five Molotov cocktails used a cloth wick stuffed in the bottle opening (Id.).   The fifth Molotov cocktail utilized a homemade detonator, with a green pyrotechnic fuse, held in place over the bottle's opening by epoxy cement[1] (Id.).   Specifically, Count 1 charges on or about September 27, 2015, in Simpson County, Kentucky, Gwathney-Law knowingly possessed a firearm that was not registered to him in the National Firearms Registration and Transfer Record, as required by 26 U.S.C. § 5841, in violation of 26 U.S.C. §§ 5861(d) and 5871 (Id.).   Count 2 charges on or about the same date, in Simpson County, Kentucky, Gwathney-Law knowingly made a firearm in violation of 26 U.S.C. §§ 5861(f) and 5871 (Id.).   The indictment indicates the term "firearm" is defined broadly enough under 26 U.S.C. §§ 5845(a)(8) and (f) to include the five Molotov cocktails[2]  (DN 4).

In his motion to suppress, Gwathney-Law asserts that on September 27, 2015, officers with the Franklin Police Department came to his residence (DN 28).   Gwathney-Law contends as a result of a warrantless search, the police recovered evidence that is being used to prosecute him (Id.).   Additionally, Gwathney-Law reports the police interviewed him and has notified the

---

[1]  The fused detonator utilized a silver $CO_2$ cartridge containing explosive powder and small pieces of paper soaked in the same flammable liquid found in the bottle (DN 4).

[2]  The definition of firearm includes "a destructive device."   26 U.S.C. §§ 5845(a)(8).   The term "destructive device" has several meanings, including an "incendiary" "bomb".   26 U.S.C. § 5845(f).

defense of his statements pursuant to Fed. R. Crim. P. 16(a)(1)(A) (Id.).   Gwathney-Law moves to suppress all physical and testimonial evidence collected by the police that day (Id.).

During the evidentiary hearing, the United States called Lieutenant Dale Adams and Patrol Officer Serhiy Varyvoda of the City of Franklin Police Department to testify about the events that occurred on September 27, 2015 (DN 40 PageID #90; DN 41 Transcript).   Additionally, the United States submitted into evidence Government Exhibit 1, a DVD containing video clips from the body camera of Lieutenant Adams on September 27, 2015, and Government Exhibit 2, a DVD containing video clips from the body camera of Officer Varyvoda on September 27, 2015 (DN 40 PageID #90; DN 39 Exhibit Inventory; DN 41 Transcript).   Gwathney-Law did not testify during the hearing but did extensively cross-examine both prosecution witnesses (DN 41).

<u>Evidence Presented During the Evidentiary Hearing</u>

<u>Lieutenant Dale Adams</u>

Lieutenant Adams testified first on behalf of the United States.   He has been with the Franklin Police Department for ten years, and prior to that worked for two years with the Bowling Green Police Department (DN 41 PageID # 95-96).   In connection with his testimony, AUSA Lawless played excerpts of video footage that Lieutenant Adams' body camera recorded when he, Officer George Arnold, and Officer Varyvoda went to Gwathney-Law's residence at 402 Railroad Street around 6:50 p.m. on September 27, 2015 (Id. PageID #95-101, 107; DN 39 Government Exhibit 1).

At approximately 6:30 p.m., through the computer-aided dispatch system ("CAD") and a telephone conversation, a dispatcher notified Lieutenant Adams about a telephonic tip from William Creek (DN 41 PageID # 107-116).   The tip indicated when Mr. Creek visited Gwathney-Law earlier in the day he saw some homemade explosive devices stored in an old stove

3

in a shed behind the residence (Id.).   Mr. Creek describe the explosive devices as glass bottles with rags coming out of them and one with a fuse (Id.).   Lieutenant Adams decided to do a knock and talk to investigate whether there was any truth to what Mr. Creek reported (Id.).

The video footage from Lieutenant Adams' body camera shows Gwathney-Law, his mother Penny Law ("Ms. Law"), and grandmother standing just inside the front door of the residence while Lieutenant Adams explained the police were there to investigate a tip from Gwathney-Law's friend (DN 41 PageID # 95-101; DN 39 Government Exhibit 1 First Clip at 00:10-02:25).   Specifically, a tip that there may be pipe bombs or something like that stored in a shed on the property (Id.).   Gwathney-Law and his mother both denied that there was "anything like that" in the shed (Id.).   However, Gwathney-Law and his mother confirmed that William Creek was a friend of Gwathney-Law and had visited earlier that day (Id.).

Lieutenant Adams advised that the tip indicated Gwathney-Law was planning to use the pipe bombs to blow-up the middle school that night or the next day (DN 41 PageID # 95-101; DN 39 Government Exhibit 1 First Clip at 00:10-02:25).   Gwathney-Law and his mother denied that Gwathney-Law wanted to blow-up the school and explained that was "years ago" when Gwathney-Law was mentally disturbed (Id.).   Lieutenant Adams explained that he knew Mr. Creek liked to make things up but this was the type of thing Lieutenant Adams could not ignore and needed to investigate (Id.).   Ms. Law indicated she understood and assured Lieutenant Adams that since the earlier incident Gwathney-Law had been through therapy and was a "good boy" (Id.).   Lieutenant Adams then asked, "to be 100% sure, may we look in the shed?"[3] (Id.).   Ms. Law responded, "sure" and then directed Gwathney-Law to take the officers out to the shed

---

3 On cross-examination, Lieutenant Adams acknowledged that he did not mention that he wanted to search inside an old stove in the shed (DN 41 PageID # 116-17).

"because you know where lights are out there" (Id.).   Before leaving the residence, Gwathney-Law provided his identification to the officers and confirmed that he was 18 years old (Id.).

The video shows Gwathney-Law, dressed only in a pair of camouflage underpants and slippers, leading the other officers out to the shed and then opening the left-half of the double door to allow ingress to the shed (DN 41 PageID # 95-101; DN 39 Government Exhibit 1 First Clip at 02:25-03:43).   The officers explained for safety reasons they wanted Gwathney-Law to stand outside the door to the shed while they looked around inside with their flashlights (Id.). Gwathney-Law complied with their request and advised them where the light switch was located (Id.).   Before the lights were turned on, Lieutenant Adams and Officer Arnold can be heard discussing Mr. Creek's claim that the bombs were in a stove (Id.).

As Lieutenant Adams attempted to open the stove door, Gwathney-Law indicated "that doesn't open" (DN 41 PageID # 95-101; DN 39 Government Exhibit 1 First Clip at 03:44-04:26). Lieutenant Adams responded "it will" and moved the stove over a few inches so the oven door could be lowered open (Id.).   The lights in the shed came on as Lieutenant Adams lowered the oven door to the stove and discovered on the middle rack several bottles lying on their sides with cloth rags protruding from their openings (Id.).   By this point, Gwathney-Law was standing in the shed within a few feet of the stove and he explained "those bottles have oil in them" (Id.). Lieutenant Adams then asked "why are they like that?" and Gwathney-Law responded "I don't know" (Id.).   Lieutenant Adams then commented "that one's got a fuse on it just like he said" (Id.).   Gwathney-Law asked "what" as he approached the stove with his arm extended toward the

bottle (Id.).   Lieutenant Adams interceded and Gwathney-Law responded "there's no way" (Id.).
Lieutenant Adams then asked "what do you call that?" (Id.).   Gwathney-Law responded "I don't
know" (Id.).

By this point in time Ms. Law was also in the shed (DN 41 PageID # 95-101; DN 39
Government Exhibit 1 First Clip at 04:27-05:40).   Lieutenant Adams asked if she knew the bottles
were in the stove and she responded "no" (Id.).   Lieutenant Adams explained to Ms. Law that the
bottles were called Molotov cocktails and "you light them on fire and blow stuff up with them"
(Id.).   Gwathney-Law responded "I assure you those bottles wouldn't break unless you took a
sledge hammer to them" (Id.).   Additionally, Gwathney-Law assured the officers that the bottles
only contained oil and he used rags to seal the bottles (Id.).   Yet Gwathney-Law claimed not to
know anything about the bottle with the fuse (Id.).   Lieutenant Adams responded by pointing out
the gas fumes were pretty strong and directed Gwathney-Law to exit the shed (Id.).   After
Gwathney-Law exited the shed, Lieutenant Adams instructed Officer Varyvoda to "read him his
rights but he's not under arrest" (Id.).   Lieutenant Adams directed Officer Varyvoda to advise
Gwathney-Law of his rights because some type of criminal violation had occurred and they needed
to ask Gwathney-Law some questions about the bottles (Id.).

Lieutenant Adams testified that Officer Varyvoda went outside the shed, advised
Gwathney-Law of his Miranda rights, and then asked him some questions (DN 41 PageID #
117-18).   Meanwhile, Lieutenant Adams and Ms. Law remained inside the shed (DN 41 PageID #
95-101; DN 39 Government Exhibit 1 at First Clip at 05:41-09:00).   Lieutenant Adams explained
that Mr. Creek reported being over earlier in the day and that Gwathney-Law showed Mr. Creek
the Molotov cocktails and indicated he was planning to blow-up the school (Id.).   Ms. Law
explained "my son is autistic and he does not think of things, you know, like normal people would,

6

to him he just put something in so it wouldn't leak out, he didn't think, you know, this is something that's going to look like a fuse" (Id.).   Meanwhile, Gwathney-Law, who is standing outside the shed, can be overheard explaining to Officer Varyvoda that the bottles aren't weapons because they won't break, they contain just oil, and there shouldn't be any gas (Id.).

After a few minutes, Lieutenant Adams stepped out of the shed with Ms. Law (DN 39 Government Exhibit 1 First Clip at 10:37-15:08).   Lieutenant Adams advised Gwathney-Law that he would speak with someone at the State Police to determine what they should do (Id.). Lieutenant Adams also asked Gwathney-Law some questions and in response Gwathney-Law acknowledged that Mr. Creek had seen the bottles earlier in the day (Id.).   Notably, Gwathney-Law declined to explain why he made the Molotov cocktails (Id.).   Because of the deafening sound of a freight train passing on the nearby tracks and a cell phone call, Lieutenant Adams terminated their conversation and directed Gwathney-Law, his mother, and grandmother to go back inside the residence (DN 41 PageID # 101-105, 117-19; DN 39 Government Exhibit 1 First Clip at 10:37-15:08).

Lieutenant Adams subsequently went to the residence door, opened it slightly while knocking, and then fully opened the door and stepped into what might be described as a family or great room at the front of the house (DN 41 PageID # 117-19; DN 39 Government Exhibit 1 Third Clip at 00:33-44).   Gwathney-Law's grandmother was seated in an upholstered chair just a few feet from the door and immediately to the left of Lieutenant Adams (DN 39 Government Exhibit 1 Third Clip at 00:33-45).   Gwathney-Law was at the other end of the room, seated on the corner of his bed (Id. Third Clip at 00:45-1:08).   Lieutenant Adams announced to Gwathney-Law and his grandmother "were going to have the Fire Chief over here and just decide how he wants to take them" (Id.).   At that point, Gwathney-Law commented "so you're going to get rid of them and I'm

going to jail" (Id.).   Lieutenant Adams responded "I didn't say that" (Id.).   Gwathney-Law countered "I haven't said that much, I've seen Law and Order so much" (Id.).   Lieutenant Adams then said "ok, well ah, I just want to talk with you a little bit more about that" (Id.).   The video clip shows Gwathney-Law reach out with both arms and pull a leather office chair toward and facing himself while commenting to Lieutenant Adams "sure, have a seat" (Id.).   Lieutenant Adams walked over and sat down in the chair facing Gwathney-Law while he engaged in a conversation with Gwathney-Law and his grandmother about a cat near the chair (Id.).

Lieutenant Adams then asked Gwathney-Law "so when did exactly you make those?" (DN 39 Government Exhibit 1 Third Clip at 1:08-11:35).   Despite Lieutenant Adams' request for more specific information, Gwathney-Law would only indicate that he made them "months ago" (Id.). At this point, Ms. Law walked into the room and sat down in an upholstered chair several feet behind her son (Id.). When Ms. Law started to answer a question about an earlier threat to the middle school, Lieutenant Adams asked her not to interrupt his conversation with Gwathney-Law (Id.).   During their conversation, Gwathney-Law insisted that he only put oil in the four bottles with a rag stuffed in the opening even though Lieutenant Adams pointed out there was a noticeable chemical or gasoline smell (Id.).   Additionally, Gwathney-Law denied making the bottle that had the fuse/detonator and maintained he had no idea how it got into the stove (Id.).   Gwathney-Law also pointed out that the Franklin Police came to their residence at 5:00 a.m. that day because someone broke into the shed (Id.).   Gwathney-Law insisted he had no intention of using those bottles (Id.).   As Lieutenant Adams stood up and started to walk toward the door he instructed "you guys stay put" (Id.).   In response to Ms. Law's request, Lieutenant Adams indicated they

could go outside to watch the eclipse but warned them to stay away from the shed (Id.). Lieutenant Adams then stepped out of the house, leaving Gwathney-Law with his mother and grandmother (Id.).

After meeting with officers outside and talking with the county attorney by cell phone, Lieutenant Adams walked back to the front door of Gwathney-Law's residence (DN 41 PageID # 104-105; DN 39 Government Exhibit 1 Fourth Clip at 03:00-05:00).   While standing on the front door step with another officer present, Lieutenant Adams advised Gwathney-Law that he was being charged with possession of a destructive device and taken to jail (Id.).   Additionally, Lieutenant Adams informed Gwathney-Law that an ATF agent was coming to look at the bottles and may want to talk with him at the jail (Id.).   At that point, Gwathney-Law indicated "I'd like a lawyer" (Id.).   Lieutenant Adams indicated "that's totally your right, so I won't ask you any more questions until you consult with your attorney" (Id.).   During the evidentiary hearing, Lieutenant Adams confirmed that no one from law enforcement asked Gwathney-Law questions after that point in time (Id.).   Lieutenant Adams transported Gwathney-Law to the Simpson County Jail and personally handled his booking on the charges (DN 39 Government Exhibit 1 Fourth Clip at 06:00-11:20).

Lieutenant Adams testified that he called the ATF about the Molotov cocktails and an hour or so later FBI Special Agent Laferte and ATF Special Agent Hayes arrived (DN 41 PageID # 101-106; DN 39 Government Exhibit 1 Fifth Clip at 00:06-05:00).   After arriving and consulting with Lieutenant Adams, the Special Agents walked to the front door of the residence (Id.). Special Agent Laferte knocked on the door and when Ms. Law answered, he asked if they could look around the house to make sure there was nothing else of danger (Id.).   Ms. Law welcomed them into the residence by saying "come on" and stepping back to allow Special Agent Laferte,

9

Special Agent Hayes, and Lieutenant Adams to enter the residence (Id.).   Ms. Law explained that all of Gwathney-Law's belongings were in the front main room and she answered questions as the agents looked through his belongings (Id.).   Ms. Law and Gwathney-Law's grandmother were present while Special Agents Laferte and Hayes conducted a search that lasted approximately three and a half minutes (Id.).

Officer Serhiy Varyvoda

Officer Varyvoda has four years of experience as a police officer with the Franklin Police Department (DN 41 PageID # 149-151).   Officer Varyvoda's testimony and his body camera video confirms Lieutenant Adams' testimony and body camera video beginning with the initial discussion at the residence door to when Lieutenant Adams instructed Officer Varyvoda to advise Gwathney-Law of his Miranda rights (DN 41 PageID # 149-153; DN 39 Government Exhibit 2 Clip at 03:28-07:55).   Officer Varyvoda's testimony and video footage indicates, after stepping out of the shed, he attempted to calm a visibly anxious Gwathney-Law and advise him about his Miranda rights (DN 41 PageID # 153-154; DN 39 Government Exhibit 2 Clip at 08:00).   The following exchange occurred:

> Varyvoda -- Have you ever been read your Miranda rights before, man?   Your Miranda warning / Miranda rights?   Like you have the right . . .
>
> Gwathney-Law -- I've heard it on the Law and Order.
>
> Varyvoda -- O.K. Well, you have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to an attorney.   If you cannot afford an attorney, one will be appointed to you. And . . .
>
> Gwathney-Law -- Am I under arrest?

> Varyvoda -- No. And, you may stop the questioning at any time by refusing to answer further, or by requesting to consult with your attorney.   Do you understand your rights sir?
>
> Gwathney-Law -- Yes, I do.
>
> Varyvoda -- You're not under arrest right now. But, you're detained. You're not free to go.   O.K.?   Just hold on right here. O.K.?

(DN 39 Government Exhibit 2 Clip at 08:00-08:36)

Officer Varyvoda then attempted to engage Gwathney-Law in small talk to calm a visibly anxious Gwathney-Law (DN 39 Government Exhibit 2 Clip at 08:36-13:06).   However, Gwathney-Law blurted out "oh God I'm so nervous right now" (Id.).   Officer Varyvoda asked "why" and Gwathney-Law explained "because I didn't know that was in there" (Id.). Gwathney-Law admitted he knew about the bottles but claimed there was only oil in them and the bottles were not weapons because they "wouldn't break" if thrown (Id.).   Officer Varyvoda then asked Gwathney-Law about the mental problems that he had mentioned having a few years ago (Id.).   Gwathney-Law made a general statement about problems with being bullied which made him angry and that he wanted to take it out on something but explained that nothing really happened (Id.).

On cross-examination, Officer Varyvoda acknowledged that he sometimes uses small talk to build a rapport with a suspect that he is interviewing (DN 41 PageID # 155-56).   Officer Varyvoda indicated from memory he orally advised Gwathney-Law of his Miranda rights (Id.). Officer Varyvoda acknowledged he left-out the part where he is supposed to indicate Gwathney-Law had the right to have an attorney present during questioning (Id.).   Officer

Varyvoda also acknowledged that he did not ask Gwathney-Law if he waived his Miranda rights (Id.).  Officer Varyvoda does not know whether Gwathney-Law was advised of his Miranda rights at any other time that night (Id.).

## CONCLUSIONS OF LAW

### A

"The Fourth Amendment provides that individuals shall be free from warrantless unreasonable searches and seizures in their 'persons, houses, papers, and effects.'"  Hardesty v. Hamburg Twp., 461 F.3d 646, 651 (6th Cir. 2006) (*quoting* U.S. Const. Amend. IV).  However, "[i]t is well-settled that a person may waive his Fourth Amendment rights by consenting to a search. . . . Consent to a search 'may be in the form of words, gesture, or conduct.' . . . In whatever form, consent has effect only if it is given freely and voluntarily."  United States v. Carter, 378 F.3d 584, 587 (6th Cir. 2004) (internal quotations and citations omitted).

"Whether consent was free and voluntary so as to waive the warrant requirement of the Fourth Amendment is 'a question of fact to be determined from the totality of all the circumstances.'"  Id. (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973)).  An assessment of the totality of all the surrounding circumstances should include consideration of "both the characteristics of the accused and the details of the interrogation."  Schneckloth, 412 U.S. at 226 (citations omitted).  For example, courts have taken into account the accused's youth, the accused's lack of education or low intelligence, the lack of any advice to the accused about his constitutional rights, the length of detention, and the deprivation of sleep or food.  Id.  Notably, no one factor is determinative in assessing whether consent was free and voluntary.  Id. at 226-27.  "It is the Government's burden by a preponderance of the evidence, to show through 'clear and

positive' testimony that valid consent was obtained." United States v. Hinojosa, 606 F.3d 875, 881 (6th Cir. 2010) (*quoting* United States v. Burns, 298 F.3d 523, 541 (6th Cir. 2002)).

1

Gwathney-Law does not dispute that his mother had the authority to consent to a search of the shed (DN 47).   Instead, Gwathney-Law contends that Lieutenant Adams should have asked for permission to search the stove in the shed because he knew the tip indicated the bombs were stored in the stove (Id. at 3-5).   Gwathney-Law reasons because of this omission the police did not have specific consent as to the scope of the search, namely opening and searching the stove (Id.). Gwathney-Law also points out that the police could have provided Ms. Law with a written consent form or advised that she could refuse consent (Id.).   For these reasons, Gwathney-Law believes the United States has failed to sustain its burden and the fruits of the search must be suppressed (Id.).

When "law enforcement officers rely upon consent as the basis for a warrantless search, the scope of the consent given determines the permissible scope of the search." United States v. Grant, 112 F.3d 239, 242 (6th Cir. 1997) (citing Florida v. Jimeno, 500 U.S. 248, 251-252 (1991)). An objective reasonableness standard is used to measure the scope of the consent given.   Id. Specifically, the Court must assess "what would the typical reasonable person have understood by the exchange between the officer and the suspect?"   Jimeno, 500 U.S. at 251 (citing Illinois v. Rodriguez, 497 U.S. 177, 183-89 (1990)).   "The scope of a search is generally defined by its express object."   Jimeno, 500 U.S. 251 (citing United States v. Ross, 456 U.S. 798 (1982)). Notably, the term "look" places no particular limitation on the scope of the search.   Grant, 112 F.3d at 242.

13

Here, based on what Lieutenant Adams said to Ms. Law, the typical reasonable person would have understood that he was seeking consent to search the shed for pipe bombs which are inherently dangerous devices.   Ms. Law manifested her consent through both her words and actions, and she did not place any explicit limitation on the scope of the search.   Because Lieutenant Adams informed Ms. Law that they would be looking for pipe bombs in the shed, it was objectively reasonable for the officers to conclude that the general consent to search the shed included consent to search things within the shed where the pipe bombs might be secreted.   A reasonable person may be expected to know that dangerous devices like pipe bombs and Molotov cocktails are generally concealed, rather than left out in the open, in order to avoid discovery.

Next, Gwathney-Law claims that Lieutenant Adams should have advised Ms. Law of her right to refuse his request to search the shed.   However, proof of knowledge of the right to refuse is not a necessary prerequisite of demonstrating voluntary consent.   Schneckloth v. Bustamonte, 412 U.S. 218, 232-45 (1973).   Instead, the Court must consider the totality of the circumstances to determine whether consent was knowingly and voluntarily given, and uncontaminated by duress or coercion.   *See* United States v. Canipe, 569 F.3d 579, 602 (6th Cir. 2009).   Clearly, this is not a case where the police used an overwhelming show of force, trickery, and/or lies to gain consent to search the shed.   Instead, the video footage shows that Lieutenant Adams sought Ms. Law's consent to search because of Mr. Creek's tip about innately hazardous devices being stored in the shed.   Certainly, Lieutenant Adams could have asked Ms. Law to execute a written consent form. However, the video clips memorializing the exchange between Lieutenant Adams and Ms. Law are sufficient to determine, based upon the totality of the circumstances, that Ms. Law's oral consent was knowingly and voluntarily given, and was not contaminated by duress or coercion. Therefore, the undersigned concludes that the United States has demonstrated by a preponderance

14

of the evidence that Ms. Law knowingly and voluntarily consented to a search for pipe bombs in the shed and that her authorization to search included looking inside the stove stored in the shed.

2

Gwathney-Law's motion seeks an order suppressing all physical evidence collected as a result of a search of his residence (DN 28).   The evidence presented during the evidentiary hearing shows that law enforcement officers did conduct a search of the residence after five Molotov cocktails were discovered during a search of the shed.   However, Gwathney-Law's post-hearing memorandum does not set forth any argument in support of his original contention that all physical evidence collected during the search of the residence should be suppressed. Certainly, the Court could construe Gwathney-Law's silence in the post-hearing brief as waiver of that claim.[4]   Instead, the undersigned will address the merits of this claim.

The uncontroverted evidence demonstrates that Lieutenant Adams and Special Agents Laferte and Hayes walked to the front door of the residence.   Special Agent Laferte knocked on the front door and, when Ms. Law answered, he asked if they could look around the house to make sure there was nothing else of danger (Id.).   Ms. Law welcomed them into the residence by saying "c'mon" and she stepped back to allow all three law enforcement officers to enter the residence (Id.).   *See* United States v. Smith, 973 F.2d 1374, 1376 (8th Cir. 1992) (stepping aside and motioning officers to enter held to be implied consent).   Notably, Ms. Law directed the law enforcement officers to Gwathney-Law's belongings in the front main room and she answered their questions (Id.).   The undersigned concludes that the United States has demonstrated by a preponderance of the evidence that Ms. Law knowingly and voluntarily consented to the search of

---

4 It is well-established that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."   United States v. Layne, 192 F.3d 556, 566 (6th Cir.1999) (quoting McPherson v. Kelsey, 125 F.3d 989, 995-96 (6th Cir.1997)); *see also* Brindley v. McCullen, 61 F.3d 507, 509 (6th Cir.1995) (observing that "[w]e consider issues not fully developed and argued to be waived.").

her residence.

B

The Supreme Court has held that when a suspect "is taken into custody or otherwise deprived his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Miranda v. Arizona, 384 U.S. 436, 478 (1966). To protect the suspect's privilege against self-incrimination, the authorities must warn the suspect prior to any questioning "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." Id. at 478-79. After the Miranda rights have been given the suspect may voluntarily, knowingly, and intelligently waive those rights and agree to answer questions. Id. at 444, 479. However, the authorities cannot question the suspect if he indicates that he wishes to consult with an attorney before speaking or that he does not wish to be interrogated. Id. at 444.

The objective test, for determining if an individual is in custody, is whether a reasonable person in the individual's position, knowing the facts as the individual knew them, would have felt that he was under arrest or was "otherwise deprived of his freedom of action in any significant way." Id. at 477. Thus, the test does not turn on the subjective views of the person being questioned or the interrogating officer. Stansbury v. California, 511 U.S. 318, 323 (1994) (citation omitted).

An in-home encounter between the police and a citizen generally will be non-custodial. United States v. Panak, 552 F.3d 462, 466 (6th Cir. 2009). However, an interrogation at home may become custodial if the circumstances are such that a reasonable person would perceive that he was under arrest or was deprived of his freedom of movement. Id. at 466-67. One of the

16

factors to consider in the home-interrogation context is whether a reasonable person would have believed he could not ask the law enforcement officers to leave.  Id. at 467.

Notably, Miranda warnings are not triggered by the mere placement of an individual into an officer's custody, rather the warnings must be given before any "interrogation" begins.  Rhode Island v. Innis, 446 U.S. 291, 300 (1980).  In Miranda the Supreme Court defined interrogation as "questioning initiated by law enforcement officials."  Miranda, 384 U.S. at 444.  The Supreme Court has extended the definition of interrogation to the "functional equivalent" of express questioning and includes, "any words or actions on the part of police ... that the police should know are reasonably likely to elicit an incriminating response from the suspect."  Innis, 446 U.S. at 301. Thus, a custodial interrogation includes "words or actions that, given the officer's knowledge of any special susceptibilities of the suspect, the officer knows or reasonably should know are likely to 'have ... the force of a question on the accused' ... and therefore be reasonably likely to elicit an incriminating response."  Pennsylvania v. Muniz, 496 U.S. 582, 601 (1990) (citation omitted).

The United States argues that Gwathney-Law was not subjected to a custodial interrogation before Lieutenant Adams formally placed him under arrest (DN 45 at 4-6).   If the Court finds Gwathney-Law was subject to a custodial interrogation at his home, then the United States argues it occurred after Officer Varyvoda administered a *Miranda* warning that met all constitutional requirements, and Gwathney-Law's actions constitute a valid implied waiver of his *Miranda* rights (Id. at 6-7).  Specifically, the United States points out that Gwathney-Law told Officer Varyvoda that he had heard the rights before on Law and Order (a television show) and understood them (Id.).   The United States asserts that Gwathney-Law must have understood his rights because he requested an attorney when Lieutenant Adams formally placed him under arrest (Id.).

17

Gwathney-Law argues the words and actions of Officer Varyvoda demonstrate although he was not under formal arrest, he was nevertheless in custody because Officer Varyvoda indicated Gwathney-Law was "detained and not free to go" (DN 47 at 6-10; DN 39 Government Exhibit 2 Clip at 08:30).   Additionally, Gwathney-Law asserts that Officer Varyvoda inadequately advised him of his Miranda rights and failed to ask if he waived those rights before asking questions. Gwathney-Law suggests that the seriousness of Officer Varyvoda's mistakes are compounded by Gwathney-Law only being 18 years old at the time and suffering from autism and Asperger's syndrome (DN 47 at 6-10).   Further, Gwathney-Law contends that after Officer Varyvoda completed his questioning the police twice ordered him back inside his home while they remained on the property (Id.).   Next, Gwathney-law argues that Lieutenant Adams entered his residence without permission and questioned him without giving him Miranda warnings (Id.). Gwathney-Law points out that Lieutenant Adams directed him to remain in his residence (Id.; DN 39 Government Exhibit 2 Third Clip at 11:20).   For these reasons, Gwathney-Law believes the Court must suppress his statements to Officer Varyvoda and Lieutenant Adams as fruit of the poisonous tree.

1

After Lieutenant Adams discovered the Molotov cocktails in the stove, he directed Gwathney-Law to step outside of the shed (DN 39 Government Exhibit 1 First Clip at 05:08-05:39).   After Gwathney-Law exited the shed, Officer Varyvoda followed and made it abundantly clear that he was not under arrest but he was being detained and this meant he was not allowed to go back in the house despite his orally expressed desire to do so (DN 39 Government Exhibit 2 Clip at 07:53-08:53).   The undersigned concludes that a reasonable person in

18

Gwathney-Law's position, knowing the facts as Gwathney-Law knew them, would have felt that his freedom of action was deprived in a significant way. Miranda, 384 U.S. at 477. Thus, Gwathney-Law was placed into custody after he exited the shed.

After Lieutenant Adams exited the shed, he began to ask Gwathney-Law some questions but they were interrupted by the noise of a freight train passing on the nearby tracks and a cell phone call to Lieutenant Adams (DN 39 Government Exhibit 1 First Clip at 11:46-14:48). Lieutenant Adams directed Gwathney-Law, his mother, and grandmother to go back in the house because the Kentucky State Police instructed him to create a 500 foot perimeter (Id.). When they instead remained in the yard, Lieutenant Adams made it clear that he wanted Gwathney-Law, his mother, and grandmother to go into the house and remain there until further notice. Video footage from Lieutenant Adams' body camera shows in addition to the officers in and around the shed, there were two officers standing near the front corner of the residence and that Gwathney-Law, his mother, and grandmother passed these officers on their way into the house (Id.). A reasonable person in Gwathney-Law's position, knowing the facts as Gwathney-Law knew them, would have felt that his freedom of action continued to be deprived in a significant way. See Miranda, 384 U.S. at 477.

When Lieutenant Adams entered the residence he did not indicate that Gwathney-Law was free to leave, free to cut off his questioning at any point, or free to ask the officers to leave his property (DN 39 Government Exhibit 1 Third Clip at 00:33-11:36). Further, after completing the questioning Lieutenant Adams directed Gwathney-Law to "stay put" (Id.). True, Ms. Law asked if they could go out to watch the eclipse and Lieutenant Adams indicated they could (Id.). However, it was not reasonable for Gwathney-Law to believe he was free to leave the property. Further, it was not reasonable for Gwathney-Law to believe he could ask the officers to leave

19

because Lieutenant Adams found Molotov cocktails in the shed and had indicated the Kentucky State Police and the Franklin Fire Chief would be joining the investigation.   Therefore, a reasonable person in Gwathney-Law's position, knowing the facts as Gwathney-Law knew them, would have felt that his freedom of action continued to be deprived in a significant way until Lieutenant Adams returned to the house and formally arrested him.

In sum, the totality of the circumstances indicates Officer Varyvoda placed Gwathney-Law in custody and Gwathney-Law remained that way until Lieutenant formally arrested him on the front door step later that evening.

2

After Lieutenant Adams discovered the Molotov cocktails in the stove, he directed Gwathney-Law to step outside of the shed and instructed Officer Varyvoda to "read him his rights but he's not under arrest" (DN 39 Government Exhibit 1 First Clip at 05:08-05:39).   Upon exiting the shed, Officer Varyvoda specifically asked Gwathney-Law if he had previously been read his *Miranda* rights (DN 39 Government Exhibit 2 Clip at 08:03-08:53).   Gwathney-Law indicated that he had heard them on Law and Order (a television show) (Id.).   Officer Varyvoda relied on his memory when he orally advised Gwathney-Law of his *Miranda* rights (Id.; DN 41 PageID # 155-56).

The parties agree, Officer Varyvoda failed to advise Gwathney-Law that he had the right to have an attorney present during questioning, but they disagree on the significance of this omission. Additionally, Gwathney-Law takes issue with Officer Varyvoda's failure to have him expressly waive his *Miranda* rights.

The Supreme Court has "never insisted that *Miranda* warnings be given in the exact form described in that decision."   Duckworth v. Eagan, 492 U.S. 195, 203 (1989) (quoting California v.

20

_Prysock_, 453 U.S. 355, 361 (1981) (per curiam)).   Further, the Supreme Court has indicated that "no talismanic incantation [is] required to satisfy its strictures."   _Prysock_, 453 U.S. at 359.   Thus, district courts "need not examine _Miranda_ warnings as if construing a will or the terms of an easement."   _Duckworth_, 492 U.S. at 203.   Instead, "[t]he inquiry is simply whether the warnings reasonably 'conve[y] to [a suspect] his rights as required by _Miranda_.'"   _Id._   The Supreme Court has indicated the warning given should be examined to determine whether the reference to the right to appointed counsel is linked with some future point in time after the police interrogation. _Prysock_, 453 U.S. at 360.   In _United States v. Massengill_, a law enforcement officer gave the _Miranda_ warnings from memory and failed to mention that the defendant "has a right to have an attorney present during questioning."   No. 1:14-cr-72, 2016 WL 3264219, at *5 (E.D. Tenn. June 14, 2016).   The district court relied on the Supreme Court's directives in _Prysock_ and _Duckworth_ when it concluded "nothing about the warning given insinuated that the right to an attorney was tied to some future event.   Even if the warnings could have been clearer, they reasonably conveyed the essential elements required by _Miranda_."   _Massengill_, 2016 WL 3264219, at *5.

Here, nothing about the _Miranda_ warning given by Officer Varyvoda insinuated that the right to an attorney was tied to some future event after the police questioning.   While the warnings that Officer Varyvoda gave to Gwathney-Law could have been clearer, they reasonably conveyed the essential elements required by _Miranda_.   Therefore, the undersigned concludes that Officer Varyvoda adequately advised Gwathney-Law of his _Miranda_ rights.

The Sixth Circuit has commented that in assessing whether a waiver of _Miranda_ rights is knowing and intelligent, "[t]he relevant question is not whether the 'criminal suspect [knew] and [understood] every possible consequence of a waiver of the Fifth Amendment privilege,' but rather whether the 'suspect [knew] that he [could] choose not to talk to law enforcement officers,

21

to talk only with counsel present, or to discontinue talking any time.'"   Garner v. Mitchell 557

F.3d 257, 261 (6th Cir. 2009) (quoting Colorado v. Spring, 479 U.S. 564, 573-74 (1987)).

Further, the Sixth Circuit has held that waiver of *Miranda* rights "'may be clearly inferred ... when

a defendant, after being properly informed of his rights and indicating that he understands them,

nevertheless does nothing to invoke those rights'" and speaks to officers.   United States v.

Adams, 583 F.3d 457, 467 (6th Cir. 2009) (quoting United States v. Nichols, 512 F.3d 789, 798-99

(6th Cir. 2008) (overruled on other grounds as recognized in United States v. Buford, 632 F.3d

264, 269 (6th Cir. 2011)).   Thus, a waiver of *Miranda* rights does not need to be in writing or

expressly made.   Adams, 583 F.3d at 467.   Instead, "courts may infer an implied waiver 'from

the actions or words of the person interrogated.'"   Id. (quoting North Carolina v. Butler, 441 U.S.

369, 373-76 (1979)).

Here, Gwathney-Law did not execute a written waiver of his *Miranda* rights.   However,

the record reflects by a preponderance of the evidence that Gwathney-Law knowingly and

voluntarily waived his *Miranda* rights.   Before giving the *Miranda* warnings, Officer Varyvoda

specifically asked Gwathney-Law if he had previously been read his *Miranda* rights (DN 39

Government Exhibit 2 Clip at 08:03-08:53).   Gwathney-Law indicated that he had heard them on

Law and Order (a television show) (Id.).   Officer Varyvoda then advised Gwathney-Law of his

*Miranda* rights and asked "do you understand your rights sir?" (Id. Clip at 08:11-08:32).

Gwathney-Law responded by nodding in the affirmative and stating, "yes, sir" (Id.).   After

acknowledging that he understood his *Miranda* rights, Gwathney-Law continued talking with

Officer Varyvoda and then spoke with Lieutenant Adams, albeit denying the bottles contained

gasoline, asserting the bottles were too thick to break if thrown and that he had no plan to use them.

22

Gwathney-Law has not presented any evidence to substantiate his bare assertion that being only 18 years old and suffering from autism and Asperger's syndrome prevented him from understanding the *Miranda* warnings.   Further, the body cam video clips from Officer Varyvoda and Lieutenant Adams show no indication that Gwathney-Law's age and suffering from autism and Asperger's syndrome prevented him from understanding the *Miranda* warnings or knowingly and voluntarily waiving his *Miranda* rights.   Moreover, after Lieutenant Adams arrested Gwathney-Law and announced that an ATF Agent might want to talk with him at the jail, Gwathney-Law made a conscious decision to withdraw his waiver by requesting a lawyer.   The United States has established by a preponderance of the evidence that Gwathney-Law knowingly and voluntarily waived his *Miranda* rights and spoke with Officer Varyvoda and Lieutenant Adams.

3

After Officer Varyvoda provided the *Miranda* warnings, the video footage shows he asked questions that prompted Gwathney-Law to discuss the bottles found in the stove and the incident that happened a few years earlier.   Certainly, an "interrogation" can involve words or actions that an officer should know are "reasonably likely to elicit an incriminating response from the suspect." Innis, 446 U.S. at 301.   Hear, unlike the circumstances in Innis, there were questions directed to Gwathney-Law that invited him to respond.   Certainly, Officer Varyvoda's initial questions about whether Gwatheny-Law had a girlfriend could reasonably be seen as small talk and not questions designed to elicit incriminating information.   However, the nature of the questions changed when Officer Varyvoda asked why Gwathney-Law was so nervous.   That question and the ones that followed invited Gwathney-Law to respond with incriminating information.   Therefore, the

undersigned concludes that Officer Varyvoda conducted a custodial interrogation after Gwathney-Law knowingly and voluntarily waived his *Miranda* rights.

After Lieutenant Adams exited the shed, Gwathney-Law initiated a conversation with Lieutenant Adams.   Essentially, Gwathney-Law tried to convince Lieutenant Adams that he had not done anything wrong (DN 39 Government Exhibit 1 First Clip at 10:36-14:50).   As there discussion continued, Lieutenant Adams pointed out that Mr. Creek's tip had been very accurate about where the bombs were located and asked Gwathney-Law what "exactly did you tell William today" (Id.).   Further, Lieutenant Adams encouraged Gwathney-Law to talk about what he was planning to do with the bottles (Id.).   Thus, Lieutenant Adams' comments and questions invited Gwathney-Law to respond with incriminating information.   Although brief, Lieutenant Adams conducted a custodial interrogation outside the shed after Gwathney-Law knowingly and voluntarily waived his *Miranda* rights.

Lieutenant Adams subsequently went to the residence door, opened it slightly while knocking, and then fully opened the door and stepped into what might be described as a family or great room at the front of the house (DN 41 PageID # 117-19; DN 39 Government Exhibit 1 Third Clip at 00:33-44).   Contrary to Gwathney-Law's assertion, Lieutenant Adams did not unlawfully enter his home.   The video from Lieutenant Adams' body cam shows that both Gwathney-Law and his grandmother displayed overt body language indicating their consent to Lieutenant Adams stepping into the residence to provide them with an update regarding the investigation.   *See* United States v. Jones, 701 F.3d 1300, 1320-21 (10th Cir. 2012) (defendants non-verbal conduct found to be legally sufficient consent for the officers to enter his residence); United States v. Villegas, 388 F.3d 317, 324-25 (7th Cir. 2004) (consent to enter can be non-verbal); United States v. Smith, 973 F.2d 1374, 1376 (8th Cir. 1992) (in the non-verbal context, a finding of implied

consent generally requires overt body language indicating consent).

After advising to Gwathney-Law and his grandmother that the Fire Chief would be determining how to deal with the bottles, Lieutenant Adams indicated he wanted to talk some more with Gwathney-Law (Id.).   The video clip shows Gwathney-Law reach out with both arms and pull a leather office chair toward and facing himself while commenting to Lieutenant Adams "sure, have a seat" (Id.).   Clearly, Gwathney-Law's verbal and non-verbal response was sufficient for Lieutenant Adams to conclude that he wished to talk.   Lieutenant Adams then asked Gwathney-Law a number of questions regarding the bottles in the shed and his earlier problems involving the law (DN 39 Government Exhibit 1 Third Clip at 1:08-11:35).   These questions were intended to elicit incriminating information from Gwathney-Law.   Thus, Lieutenant Adams also conducted a custodial interrogation in the house after Gwathney-Law knowingly and voluntarily waived his *Miranda* rights.

In sum, the United States has established by a preponderance of the evidence that after being properly informed of his *Miranda* rights and indicating that he understood them Gwathney-Law chose to waive those rights and speak with Officer Varyvoda and Lieutenant Adams.

<u>RECOMMENDATION</u>

For the foregoing reasons, the undersigned recommends that Defendant's motion to suppress (DN 28) be **DENIED**.

<u>NOTICE</u>

Therefore, under the provisions of 28 U.S.C. § 636(b)(1)(B) and Fed. R. Crim. P. 59(b)(1), the Magistrate Judge files these findings and recommendations with the Court and a copy shall forthwith be electronically transmitted or mailed to all parties.   Within fourteen (14) days after being served with a copy, any party may serve and file written objections to such findings and recommendations as provided by the Court.   Fed. R. Crim. P. 59(b)(2).   "Failure to object in accordance with this rule waives a party's right to review."   Fed. R. Crim. P. 59(b)(2).

Copies:        Counsel

26